**POTTER HANDY LLP**
Russell Handy, Esq., TX SBN 24117976
1410 E Winding Way, Suite B
Friendswood, TX 77546
Phone: (415) 534-1911
Email: ServeHT@potterhandy.com

Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| **Jane Doe (TB-00001),**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**G6 HOSPITALITY, LLC;**<br>**G6 HOSPITALITY FRANCHISING, LLC; and**<br><br>**DOES 1-10,**<br><br>**Defendants.** | **Case No.:**<br><br>**JUDGE:**<br><br>**Complaint for Damages:**<br><br>**18 U.S.C. § 1595 (TVPRA)**<br><br>**18 U.S.C. § 2255 (CAVRA)**<br><br>**Demand for Jury Trial** |

## PLAINTIFF'S COMPLAINT

## INTRODUCTION

1. Plaintiff, Jane Doe (TB-00001), files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred from the years 2015 – 2019 beginning when she was just 17 years of age. For years, Plaintiff was subjected to untold atrocities, including rape, verbal and physical attacks, humiliation, fear, and sexual assault at hotels owned, operated, maintained, and controlled by the hotel defendants (and their agents and employees) named in this case.
2. Plaintiff was trafficked in hotels owned, operated, and managed G6 Hospitality, LLC and G6 Hospitality Franchising, LLC.
3. As discussed herein, the defendants derived a financial benefit from widespread use of their hotel properties for sex trafficking, including the trafficking of Plaintiff. Despite obvious and apparent signs of sex trafficking, these defendants continued renting hotel rooms to Plaintiff's traffickers and operated the hotels in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability. Thus, these defendants are civilly liable to Plaintiff pursuant to federal anti-trafficking laws and statutory remedies.

## PARTIES

4. Plaintiff is a natural person who is a resident and citizen of Victorville, California.
5. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16). a. Due to the sensitive and intimate nature of the issues, Plaintiff requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[1]

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue

6. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[4]
7. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.
8. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[5]
9. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

---

protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp*., 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

[5] *Does I thru XXII*I, 214 F.3d at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

10. Defendant G6 Hospitality, LLC ("G6 Hospitality") is a for-profit limited liability company organized under the laws of the State of Delaware, with its principal place of business in Carrollton, Texas. G6 Hospitality is one of the largest hotel franchisors in the world and owns, operates, franchises, and/or licenses lodging facilities throughout the United States, including under the Motel 6 and Studio 6 brands. G6 Hospitality does business in a systematic and continuous manner throughout Texas, including within this District and Division.
11. Defendant G6 Hospitality Franchising, LLC ("G6 Franchising") is a Delaware limited liability company with its principal place of business in Carrollton, Texas. G6 Franchising is responsible for franchising, licensing, and exercising control over branded lodging properties, including Motel 6 locations throughout the United States. G6 Franchising does business in a systematic and continuous manner throughout Texas, including within this District and Division.
12. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff alleges that the defendants are responsible for the acts alleged herein, including under an alter-ego theory. Plaintiff will seek leave to amend this Complaint, as appropriate, to allege the true names and capacities of these fictitiously named Defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

**JURISDICTION AND VENUE**

13. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA and under CAVRA.
14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and because the CAVRA cause of action permits this lawsuit to be filed in any suitable United States District Court.

**SEX TRAFFICKING OVERVIEW**

15. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

16. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

17. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

18. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

19. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

20. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical

deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

21. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third-largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

22. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

23. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

24. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

25. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is

therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

26. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

27. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, and exploit internet and social media platforms to recruit victims and market their services. Criminal organizations also engage financial and legal entities to structure and manage their operations. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

28. For decades, sex traffickers have operated openly within hotels and motels throughout the United States. Throughout this period, traffickers conducted their activities on hotel properties while major hospitality corporations failed to take reasonable action to prevent or disrupt trafficking. Instead, many hotels and motels limited their responses to nominal anti-trafficking initiatives while continuing to collect substantial profits from trafficking occurring on their premises.

29. In fact, hotels constitute the primary locations in which sex trafficking takes place. This prevalence is not coincidental. For years, traffickers have exploited hotels as low-risk, high-profit environments. In 2014, 92 percent of reports to the Human Trafficking Hotline involved allegations of sex trafficking occurring in hotels. Moreover, hotels have been found to account for over 90 percent of the commercial sexual exploitation of children.

30. The hotel industry, including Defendants, derives substantial profits from participation in ventures that they knew or should have known were engaged in conduct violating 18 U.S.C. § 1591(a). Such participation includes renting hotel rooms used to harbor sex trafficking victims on a recurring basis and providing internet services that traffickers utilize to advertise and solicit victims for commercial sex acts. This arrangement constitutes a

mutually beneficial relationship between Defendants and traffickers, sustained by the sexual exploitation of victims.

31. In light of the established link between hotels and sex trafficking, government agencies and nonprofit organizations, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, various state Attorney Generals, Love 146, EPCAT, among others, have undertaken extensive efforts to educate the hotel industry, regarding best practices for identifying and responding to trafficking. Indicators of sex trafficking in hotel environments are well documented, follow consistent patterns, and are readily detectable by appropriately trained personnel. Comprehensive, hotel-specific toolkits have been developed to enable staff at all levels to recognize and respond to trafficking indicators. Throughout a guest's stay—from check-in to check-out—traffickers and victims display recognizable warning signs.

32. Industry participants have access to substantial publicly available information concerning the prevalence of human trafficking in hotel settings, including industry-focused reports prepared by organizations such as the Polaris Project.

33. Education and training are among the most effective means of preventing and combating sexual exploitation and human trafficking. As ECPAT concluded: "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."

34. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained." In reference to hoteliers, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

35. The well-known and pervasive relationship between sex trafficking and the hotel industry necessarily informs what Defendants knew or should have known about the trafficking of Plaintiff at Defendants' hotel.

36. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

**Plaintiff was Trafficked**

37. When she was just 15 years old Plaintiff was kidnapped by a man who lured her under the pretense of a romantic partnership. She spent several years under his control, alienated from her family, and eventually addicted to drugs.

38. Her trafficker operated principally out of Southern California, but like many traffickers, would make trips to Las Vegas, a setting known to have a large number of transient "buyers", on vacation and prepared to spend money.

39. Within the sex trafficking industry, Las Vegas offered a laid-back and lucrative setting. When traffickers felt the pressure of presence of law enforcement in their home communities, they could reliability "reset" in Las Vegas.

40. At the age of 17 Plaintiff began being trafficked out of Las Vegas. Her traffickers would force her to engage in solicitation in public locations outside of the casinos and hotels, and through online platforms, including classified advertising websites like Backpage.com.

41. When they arrived in Las Vegas, her traffickers set up shop in the Motel 6 property located at 195 East Tropicana Avenue, Las Vegas, Nevada. This location is just one block east of the main Las Vegas Boulevard and Plaintiff could easily walk to locations where she would solicit buyers.

42. The Motel 6 (subsequently rebranded as a Studio 6 Suites) Las Vegas is a two-story budget motel designed to provide low-cost, short-term lodging. The structure consists of a rectangular or U-shaped building with exterior corridors and staircases providing direct

access to guest rooms from the parking area. Guest rooms are arranged along open-air walkways on both the ground and second floors, allowing patrons to enter and exit without passing through a central lobby. The motel's design emphasizes convenience and vehicular access, with parking spaces located immediately adjacent to or in close proximity to guest room entrances.

43. While at the hotel Plaintiff was frequently under the influence of drugs and deprived of sleep. She appeared younger than 18. Plaintiff was typically dressed in leotards, lingerie, high heels, crop tops, and skirts.
44. Plaintiff's trafficker operated at this location with four girls, including two minors and two young women approximately 18 and 19 years old. The entire group traveled without significant luggage in order to leave quickly if necessary.
45. Hotel staff were made aware of what was occurring but, for the most part, chose not to intervene.
46. On one occasion, Plaintiff sought help from the Motel 6 manager who she knew as "Pete". Pete then informed her trafficker that Plaintiff was planning to leave and thus thwarted her plans.
47. Plaintiff was advertised for commercial sex acts online under an alias. Plaintiff did not control these advertisements or her interactions with buyers. Instead, traffickers arranged all encounters, dictated the terms, and compelled Plaintiff to comply with all demands.
48. Plaintiff was trapped in an environment characterized by repeated sexual violence, physical abuse, coercion, and psychological manipulation.
49. Plaintiff's traffickers possessed multiple firearms and used the presence and threat of these weapons to intimidate Plaintiff and enforce compliance.
50. While at the Motel 6 property in Las Vegas, Plaintiff was placed in rented rooms and required to meet adult men for commercial sex acts arranged by her traffickers. These encounters occurred on a repeated and ongoing basis during her stays at this location.
51. Plaintiff did not control the conditions of her stay. Instead, her traffickers arranged all room rentals, coordinated buyers, and transported Plaintiff to and from the property or directed

buyers to her location. Plaintiff did not act independently and remained under the control of her traffickers at all times.

52. During this period, Plaintiff was subjected to ongoing coercion and control, including the use of threats (to her and her family), violence, and psychological manipulation. She was required to remain available for commercial sex acts at all times of day and had limited freedom of movement or ability to leave the premises.

53. Plaintiff remained under the traffickers' control for several years. During this time, one of the traffickers, identified as J was arrested on charges related to sex trafficking and incarcerated for approximately two years. However, he was not convicted because the traffickers threatened to kill the victim involved in that case, preventing her from testifying. Following his release, the trafficking enterprise continued.

54. Plaintiff's trafficking at the Motel 6 property continued until approximately March 2021. During that time, she was repeatedly subjected to commercial sexual exploitation, physical abuse, and psychological trauma. As a direct and proximate result of being trafficked at the Motel 6 property in Las Vegas, Plaintiff suffered severe and lasting physical, emotional, and psychological harm, including trauma consistent with prolonged exploitation and abuse.

55. Plaintiff continues to suffer severe and ongoing emotional, psychological, and relational harm as a direct result of being trafficked.

**Sex Trafficking at G6 Hotels**

56. G6's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Plaintiff's trafficking that sex trafficking was ongoing and widespread at G6 properties.

57. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[6]

[6] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility* (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility

58. Public statements of G6 confirm that they knew that sex trafficking is a problem and that they retained control over the response of their branded hotels to this problem. The G6 Defendants recognize that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[7] They also acknowledged the significant role G6 has in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels."[8]

59. Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. G6 monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at G6 hotels:

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[9]
- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[10]
- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[11]
- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[12]

---

[7] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

[8] *Id.*

[9] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

[10] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[11] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[12] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download

- In January 2012, a couple was charged with prostitution and pimping at a Studio 6 in Roswell, GA.[13]
- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[14]
- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[15]
- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[16]
- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[17]
- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[18]
- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[19]

---

[13] Couple arrested for pimping, prostitution, Appen Media (Jan. 17, 2012), https://www.appenmedia.com/public_safety/couple-arrested-for-pimping-prostitution/article_473fe798-1b3d-5c6f-b230-547e3e5c4651.html

[14] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims

[15] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[16]*Suspects Busted in Anaheim Sex Ring,* ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[17] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity

[18] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[19] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[20]
- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[21]
- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[22]
- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[23]
- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[24]
- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[25]

---

[20]Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/

[21] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel,KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

[22] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

[23]Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22city/21922915/.

[24] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[25] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/. https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[26]

60. These articles represent only a limited and non-exhaustive sample. Numerous additional reports document sex trafficking and related criminal activity at G6-branded hotels. Moreover, upon information and belief, the G6 Defendants are aware of substantial additional law enforcement activity involving trafficking at their properties that was not reported in the media. In total, state and federal law enforcement agencies have prosecuted several hundred traffickers, involving hundreds of victims, for sex trafficking and forced prostitution conducted at G6-branded properties.

61. News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Plaintiff was trafficked at the subject Motel 6, G6 knew or should have known:

    a. The use of G6 branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

    b. Commercial sex work occurring at G6 branded properties involved trafficking and compelled prostitution;

    c. G6 franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at G6 hotel properties;

    d. Their efforts, if any, to stop facilitating sex trafficking in G6 branded properties were not effective; and

    e. They were, by their acts and omissions, facilitating sex trafficking at G6 branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

62. Several publicly available reviews concerning Motel 6 / Studio 6 Suites – 195 E Tropicana Ave, Las Vegas, NV, described prostitution, pimps, drug dealers, drug activity, violence, and other criminal conduct occurring openly on the property.

---

[26] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html

63. As early as 2012, a reviewer noted "a lot of prostitutes and criminals" staying at the hotel. In 2014, guests reported "hookers that troll the parking lots" and knowledge of "dealers and pimps that live there." Reviews throughout 2016 and 2017 repeatedly described "prostitutes, drug dealers, and pimps all over this hotel," "hookers everywhere," and "a lot of prostitution going on."

64. In 2018, reviews described "prostitution and drug activity," "hookers and crack heads," "prostitutes, pimps, drug deals right outside the room," and "prostitution was going on in the hotel."

65. In 2019, guests described the property as "overrun with hookers," reported "drug dealers and prostitutes," and warned others about prostitution occurring openly at the motel.

66. Reviews continued through 2020, 2021, 2022, 2023, and 2024, with guests reporting "hookers who just wander around the property," "prostitutions and drugs," "it's a prostitution motel," "too many drug dealers and prostitutes," "a lot of drugs and homeless around the property and prostitution," "drug dealers, prostitutes and pimps," "drug deals and prostitution happening all hours," and "pimps and prostitutes outside at the entrance."

67. These reviews demonstrate that prostitution and trafficking-related indicators were not isolated incidents. Rather, prostitution, pimps, commercial sex solicitation, and related criminal activity were repeatedly observed and publicly reported over more than a decade. The volume, frequency, and consistency of these complaints support a reasonable inference that Defendants knew, or should have known, that prostitution and trafficking-related activity were occurring at the property and failed to take adequate measures to prevent, deter, investigate, or report such conduct.

68. Despite the continually mounting evidence that sex trafficking at G6 branded properties was ongoing and growing, G6 did not change course. G6 chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

**Actual and Constructive Knowledge**

69. At all relevant times, the defendants knew or should have known that sex trafficking was prevalent at their hotels because the trafficking occurred openly on these premises,

followed well-established patterns, and presented with obvious indicators that Defendants recognized and acknowledged as signs of sex trafficking in a hotel environment.

70. Upon information and belief, Plaintiff's trafficker, along with other traffickers, repeatedly selected these locations to conduct sex trafficking activities because their policies and practices created a favorable environment for trafficking and because hotel staff routinely ignored or failed to act on clear indicators of trafficking. As a result, traffickers were able to operate with minimal effort to conceal their activities, based on an implicit understanding that their conduct would not be questioned or disrupted by the hotels.

71. Moreover, numerous trafficking "red flags" were observed by hotel staff and management at both locations. These indicators included, among others, payment in cash or prepaid cards; unusually high volumes of men, who were not registered guests, entering and exiting rooms at all hours; extended stays despite arriving with few personal possessions; and other conduct consistent with the well-established indicators of sex trafficking described above.

72. During the period that Plaintiff was trafficked, there were obvious signs that her trafficker was engaged in sex trafficking:

- Plaintiff would live out of the hotel for weeks at a time with a group of unrelated individuals who included up to 4 women.
- Plaintiff could be seen coming and going from the property dressed in a manner that revealed her nature of her activities and the activities of her associates.
- She would frequently return to the property with a male person, in a car or on foot, who would be seen exiting the property shortly thereafter.
- Plaintiff had heavy foot traffic of non-hotel guests and older males coming from the room she was trafficked in.
- Cleaning staff removed large amounts of sex paraphernalia, like condoms and lubricant, in the trash.
- Plaintiff or her associates prevented housekeeping staff from accessing the room for regular cleaning.

73. Other obvious signs of trafficking consistent with the modus operandi of her trafficker, which included well-known "red flags" for trafficking in a hotel.

74. Employees at these hotels, including management-level employees, observed or were made aware of these obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment.

75. As such, the defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject hotels.

76. Given these obvious signs, defendants knew or should have known about the trafficking activity that resulted in the trafficking of Plaintiff.

77. The defendants also knew or should have known about the trafficking of Plaintiff based on the numerous tools through which they monitored and supervised the subject hotels.

78. If the defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Plaintiff's traffickers at the subject properties.

79. The hotel staff and the franchisees also facilitated widespread trafficking at the properties, including the trafficking of Plaintiff in ways including, on information and belief:

    a. developing a relationship with Plaintiff's trafficker, and creating an understanding that she could operate at the hotel without risk of interference;

    b. continuing to provide rooms, services, and assistance to the trafficker in the face of obvious "red flags" of trafficking of Plaintiff and other victims;

    c. observing Plaintiff in obvious distress but continuing to provide support to her trafficker;

    d. allowing "buyers" who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

    e. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    f. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

g. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities, but, instead, could operate without concern for detection or interference by the hotel staff;

h. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

80. The defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

81. The defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**FIRST CAUSE OF ACTION: TVPRA**

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 U.S.C. § 1595 (against all defendants).

82. The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

83. The federal sex trafficking statute consists of four elements: (a) the defendant knowingly benefited, (b) from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant knew or should have known the venture violated the statute.

**Knowingly Benefited**

84. The G6 defendants knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

85. The G6 defendants fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

**The Venture Violated the TVPRA.**

86. The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

87. Defendants were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**SECOND CAUSE OF ACTION: CAVRA**

Child Abuse Victims Rights Act ("CAVRA")

18 U.S.C. § 2255 (against all defendants)

88. Federal law provides civil remedies for victims of child exploitation by way of a statute commonly referred to as "Masha's Law." The statute provides a cause of action for minors who were victims of a violation of enumerated federal laws, including 18 U.S.C. § 1591.

89. Defendants knowingly benefited from harboring Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels that they own, operate, and oversee, under the circumstances where they knew that Plaintiff, a minor, would be engaged in commercial sex acts.

90. Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## PRAYER FOR RELIEF

91. Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post- judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

## JURY DEMAND

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

Dated: June 25, 2026

By: /s/ Russ Handy .

Russ Handy, Esq. (24117976)
**POTTER HANDY, LLP**
1410 E Winding Way, Ste. B
Friendswood, TX 77546
Tel: (415) 534-1911
Fax: (888) 422-5191
E: ServeHT@potterhandy.com
Attorneys for Plaintiff